UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

SARAH ROGERS,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )          No. 1:21-cv-00293-SKL
                                       )
CITY OF CHATTANOOGA and                )
CHATTANOOGA POLICE                     )
DEPARTMENT,                            )
                                       )
        Defendants.                    )

**MEMORANDUM AND ORDER**

This is a sex-based employment discrimination and retaliation case. Plaintiff Sarah

Rogers[1] is a former officer with the Chattanooga Police Department ("CPD"). Currently before

the Court is a motion for summary judgment [Doc. 36] filed by Defendants CPD and the City of

Chattanooga. The motion is accompanied by a supporting brief and several exhibits [Doc. 36 &

Doc. 37]. Plaintiff filed a response in opposition, also with supporting exhibits [Doc. 38].

Defendants did not file a reply, and the time for doing so has passed. *See* E.D. Tenn. L.R. 7.1.

Neither side requested a hearing, and the Court finds a hearing is not necessary to resolve the

motion. This matter is now ripe. For the reasons stated below, Defendants' motion for summary

judgment will be granted.

**I.      BACKGROUND**

In 2016, Plaintiff was a cadet at the policy academy. She alleges that during an off-duty

social gathering, she was raped by fellow cadet Zachary Smith ("Smith") and his then-wife. All

---

[1] While Plaintiff's last name has changed, the Court uses "Rogers" to be consistent with the
complaint and most of the exhibits.

three were heavily intoxicated and admit to not remembering portions of the evening. Plaintiff did not report the incident to anyone at the time and simply avoided talking to Smith for the remainder of the academy. After graduation, Plaintiff and Smith did not cross paths again until September 1, 2020. When they did, Plaintiff insisted Smith report the 2016 incident and resign from the CPD. Smith reported the incident to CPD Internal Affairs ("IA") either that same day or shortly thereafter, and IA commenced an investigation. By the end of 2020, IA had determined that Smith should be charged with Unbecoming Conduct and Criminal Offenses/Felony.[2] This determination was based on statements Smith made to Plaintiff when she confronted him on September 1, 2020, as well as on Smith and his wife's "inability to refute the allegations," due to their intoxication and resulting impaired memories [Doc. 36-26 at Page ID # 340-41; Doc. 38-3 at Page ID # 529-31].

According to Plaintiff, as the investigation into these charges proceeded, Smith continued to work as normal, meanwhile Plaintiff was retaliated against, subjected to a hostile work environment, and constructively discharged. She claims the CPD sergeants who conducted her initial interview for the IA investigation into the alleged rape ambushed and threatened her with criminal prosecution; and CPD more generally "did not proceed with the investigation properly or sensitively." [Doc. 38 at Page ID # 460]. She further asserts "that her relationships with other officers immediately started to sour because she was no longer at line-ups due to the [CPD's] refusal to separate Plaintiff's assailant from her during the investigation." [*Id.*]. She claims that she was "told by fellow officers that she was no longer going to receive back up when she called." [*Id.*].

---

[2] "Charged" in this context means charged with violating CPD employment policies. The record does not reflect that criminal charges against Smith (or his former wife) were ever contemplated.

2

In addition, Plaintiff claims IA "began to open numerous 'mickey mouse' investigations, things that were normally handled by chain of command," and she was "subjected to formal investigation after formal investigation following her allegations against [Smith]." [*Id.* at Page ID # 459]. By contrast, she asserts Smith "was not subject to any discipline for his egregious acts of misconduct." [*Id.*].

Smith was granted a pre-disciplinary hearing pursuant to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), which took place on April 22, 2021. The record reflects Smith submitted evidence during the April 22 hearing, and, as a result, the hearing was continued until September 1, 2021 [Doc. 38-3 at Page ID # 532]. In the interim, CPD investigated Smith's evidence and conducted a forensic examination of his phone [*id.*].

Plaintiff resigned by letter dated April 28, 2021 [Doc. 38-1 at Page ID # 462]. Many months later, on August 30, 2021, Interim Police Chief Eric Tucker notified Smith that he (Tucker) had reviewed all the evidence and determined that the two charges against Smith (Unbecoming Conduct and Criminal Offenses/Felony) would not be sustained [Doc. 38-3 at Page ID # 532-33]. Thus, the September 1 *Loudermill* hearing was canceled.

Plaintiff filed suit in Hamilton County Chancery Court on November 1, 2021, and Defendants timely removed the case to this Court. The section of Plaintiff's complaint listing her "Claims" [Doc. 1-2 at Page ID # 9] provides:

> 19.    Defendants violated T.C.A. § 4-21-401(a)(1) by unlawfully discriminating against Plaintiff and retaliating against Plaintiff in the terms and conditions of her employment on the basis of her sex.
>
> 20.    Defendants violated 42 U.S.C. § 2000e by unlawfully discriminating against Plaintiff and retaliating against Plaintiff on the basis of her sex.
>
> 21.    Defendants are responsible for the acts of [their] supervisory agents.

3

As noted above, Defendants moved for summary judgment on all of these claims on September 1, 2023.

## II.    SUMMARY JUDGMENT

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Natl' Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.  It must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56 (c)(1).  Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56).  The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial.  *Anderson v. Liberty Lobby,*

4

*Inc.*, 477 U.S. 242, 248-49 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.

At summary judgment, the Court may not weigh evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant.  *Anderson*, 477 U.S. at 248-49.  A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374.

## III.    ANALYSIS

### A.    Gender Discrimination

Plaintiff asserts Defendants discriminated against her on the basis of her sex "by inconsistent disciplining procedures between her and her assailant a male officer." [Doc. 38 at Page ID # 448].  She claims that after Smith reported the 2016 incident at her insistence, she "became the subject of multiple IA investigations and disciplinary actions for minor infractions," while "her male co-worker and assailant was not disciplined for such egregious acts of misconduct thereby showing such disparate treatment which violates [her] rights." [*Id.* at Page ID # 449].  In short, Plaintiff's discrimination claim is mainly based on the alleged difference in treatment she received as compared to Smith after Plaintiff came forward about the 2016 incident and insisted Smith report the incident to CPD.

5

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The same principles apply to a Tennessee Human Rights Act ("THRA") claim as to a Title VII claim. *See Austin v. Alexander*, 439 F. Supp. 3d 1019, 1024 n.2 (M.D. Tenn. 2020) ("The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims." (quoting *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008))).[3]

To show discrimination based on sex, a plaintiff can rely on either direct or circumstantial evidence of discrimination based on their membership in the protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action." *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018) (citing *Rowan v. Lockheed Martin Energy Sys. Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). In this case, Plaintiff does not cite or claim to rely on direct evidence of discrimination for any of her claims, so the *McDonnell Douglas* framework applies.

Under the *McDonnell Douglas* framework, (1) the plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action; and (3) finally, the burden returns to the plaintiff to show that the defendant's stated reason is pretextual. *George*, 966 F.3d at 558.

To establish a prima facie case of discrimination, a plaintiff must show (1) "she was a member of a protected class," (2) "she suffered an adverse employment action"; (3) "she was

---

[3] The analysis of each of Plaintiff's THRA claims is the same as for her corresponding Title VII claims. Accordingly, the Court will not separately analyze the THRA claims.

6

qualified for the position"; and (4) "she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021).

Defendants' position is that Plaintiff resigned and cannot show she was constructively discharged; therefore, she cannot establish the "adverse employment action" element of her discrimination claim.[4]

### 1. Constructive discharge

As Defendants acknowledge, a "constructive discharge" can constitute an adverse employment action for the purposes of Title VII. *See Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 419-20 (6th Cir. 2015). "To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit." *Id.* at 420 (citing *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)).[5]

---

[4] As far as the Court can tell, Plaintiff's claims in this case are based only on the cumulative nature of Defendants' acts. That is, she does not claim that any single investigation or action by Defendants constitutes discrimination or retaliation; nor does she claim that any single act created a hostile work environment. The Court notes that Plaintiff was not disciplined in connection with any complaints received or investigations initiated after September 2020 when Smith first reported the 2016 incident to CPD, although several investigations were pending when she resigned [*see* Doc. 36-19].

[5] In *Tchankpa v. Ascena Retail Group, Inc.*, 951 F.3d 805, 815-17 (6th Cir. 2020), the United States Court of Appeals for the Sixth Circuit noted the subjective intent element of a constructive-discharged-based claim may have been eliminated in *Green v. Brennan*, 578 U.S. 547 (2016). The Court's holding herein is based on Plaintiff's inability to show intolerable workplace conditions, and not on whether Defendants acted specifically with the intent that Plaintiff quit. Accordingly, it is unnecessary to address whether *Green*, in fact, eliminated this element. Notably, Plaintiff advocates the continued application of the intent-to-quit element, despite also citing *Green* [*see* Doc. 38 at Page ID # 457-58]. In addition, *Green* still requires a "nexus" between the intolerable workplace and the alleged basis for discrimination. *Tchankpa*, 951 F.3d at 816; *see also id.* at 817 n.3 ("No matter what, employees need to show that the offending workplace is somehow discriminatory.").

The Sixth Circuit has described a claim of constructive discharge as "difficult to prove," and a "tough row to hoe," noting "[t]he doctrine does not protect employees who leave their job in apprehension that conditions may deteriorate later"; rather, "employees are expected to stay on the job if they can pursue other forms of relief." *Groening v. Glen Lake Cmty. Schs.*, 884 F.3d 626, 630 (6th Cir. 2018) (citations and quotation marks omitted).

As mentioned, Plaintiff's claims are based at least in part on CPD's investigations into her on-the-job conduct. Nevertheless, it is well-established that "employers are permitted to investigate their employees for wrongdoing[.]" *Id.* at 631; *see also Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) ("We have repeatedly held, however, that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action."). Plaintiff contends "there was a significant *increase in the number of investigations*" into her conduct following her allegations against Smith [Doc. 38 at Page ID # 453 (emphasis added)]. She writes: "For instance, Plaintiff became the subject of eight IA investigations between October 2020 and her constructive discharge in May 2021." [*Id.*]. Plaintiff cites her CPD IA "Officer Resume" [Doc. 36-19]. However, a review of Plaintiff's IA Officer Resume reflects that six of the eight investigations Plaintiff relies on were initiated by *citizen complaints*; another investigation followed an incident wherein Plaintiff and another officer both shot a suspect multiple times, and the suspect ultimately died [*see* Doc. 36-27]; and during the eighth incident, Plaintiff referred to or called a CPD male officer a b**ch, fa**ot, and pu**y, and asked the officer if he "was going to cry" and if he "needed a chaplain," all in front of a citizen, after the citizen discovered the dead body of his "acquaintance" in a homeless camp [Doc. 36-8 at Page ID # 198-99; Doc. 36-33].

8

Plaintiff also complains the eight investigations were carried out by IA as opposed to "Chain of Command," which Plaintiff contends was inappropriate and discriminatory. The record reflects four of the six citizen-complaint-related investigations were carried out at least partially as Chain of Command investigations, even if IA initially received the citizen complaints, consistent with CPD policy, or if IA conducted an interview at some point in the process [*see* Doc. 36-28 at Page ID # 377-79 (IA # 2020-102, December 12, 2020 incident); Doc. 36-29 at Page ID # 393-97 (IA # 2021-005, January 11, 2021 incident); Doc. 36-30 & Doc. 36-8 at Page ID # 189-90 (IA # 2021-031, February 10, 2021 incident); Doc. 36-31 & Doc. 36-8 at Page ID # 193-95 (IA # 2021-040, April 17, 2021 incident); *see also* Doc. 36-10 at Page ID # 210-213 (describing CPD procedures for processing complaints against officers and role of IA versus Chain of Command)].[6] The two citizen-complaint-related investigations that do not appear to have involved Chain of Command were resolved in Plaintiff's favor as "non-formalized" early in the process, seemingly after only the "pre-review summary" was completed by IA [*see* Doc. 36-1 & Doc. 36-2 (IA # NF 2021-008, January 19, 2021 incident); Doc. 36-14 & Doc. 36-17 (IA # NF 2021-032, January 13, 2019 incident, but citizen complaint was received two years later)]. The shooting-related investigation and the eighth incident involving the confrontation between Plaintiff and another officer were both classified as Class I Offenses, which CPD policy directs "shall" be the

---

[6] Plaintiff was asked during her deposition whether she knew Chain of Command had been involved and made findings and recommendations regarding how Plaintiff should be disciplined. Plaintiff indicated she was not aware of such involvement by Chain of Command [*see* Doc. 36-8 at Page ID # 189-90 & Page ID # 193-94].

responsibility of IA [*see* Doc. 36-10 at Page ID # 211].[7]  Plaintiff does not cite to any facts in the record indicating the involvement of IA was improper or resulted in any heightened scrutiny or untoward discipline.

Thus, even viewing the facts in the light most favorable to Plaintiff, the alleged "uptick" in investigations does not demonstrate Defendants created working conditions that were so intolerable that any reasonable person would have resigned.  Plaintiff cites to nothing in the record beyond her own conclusory deposition testimony that "IA was piling up IA investigations," and perhaps some comments from her sergeant, which are addressed below, to support her contention that these investigations were inappropriately commenced or conducted due to her sex [Doc. 36-8 at Page ID # 200].  Harassing conduct in the workplace "counts towards a showing of intolerable conditions only to the extent that [it] is based on a discriminatory motive or animus."  *See Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-cv-00491, 2022 WL 1283087, at *39 (M.D. Tenn. Apr. 28, 2022) (citations omitted).  In this case, if anything, there was an uptick in citizen complaints about Plaintiff's behavior, which IA received pursuant to CPD policy and then responded to by investigating in conjunction with Plaintiff's Chain of Command or by dismissing as non-formalized.  No reasonable juror could conclude that the citizen complaints themselves resulted from Defendants' animus toward Plaintiff, and Plaintiff has failed to show how these investigations were handled in a discriminatory manner.  During this same general time, Plaintiff

---

[7] Plaintiff complains she was "also being disciplined and reprimanded for petty or minor infractions" after she came forward with the rape allegations in September 2020 and before she resigned in May 2021 [Doc. 38 at Page ID 453].  However, Plaintiff's IA Officer Resume indicates she was only disciplined for one offense during this time.  That discipline was in connection with conduct that occurred in June 2019 and an investigation that occurred in November 2019 [*see* Doc. 36-19 at Page ID # 250 (IA # COC 2019-134)].  The investigation was completed by Chain of Command [*see* Doc. 36-23].  Plaintiff was found to have obtained arrest warrants for the wrong person, and the discipline she received was "written counseling" [*id.*; *see also* Doc. 36-19 at Page ID # 250].

was involved in a fatal shooting of a suspect and engaged in a pejorative and offensive name-calling clash with another officer in front of a citizen. No reasonable juror could conclude that mandatory IA investigations into these undisputedly serious incidents resulted from Defendants' discriminatory animus.

It appears the gravamen of Plaintiff's constructive discharge claim (and her other claims) arises from the investigations addressed above. However, Plaintiff makes several other allegations and arguments that bear on the question of whether she was constructively discharged,[8] which the Court addresses below.

Plaintiff contends the "highest ranks of CPD" exchanged emails which "showed that they wanted Plaintiff's supervisors to routinely check and monitor her engagements," and that "high ranking CPD officers" exchanged emails indicating they "were glad to have gotten rid of Plaintiff." [Doc. 38 at Page ID # 453-54 (citing emails allegedly located at Doc. 38-3 at Bates stamp #000213 & #000217)]. Plaintiff cites to two emails that the Court has been unable to locate anywhere in the record. Regardless, routine "checks" by Plaintiff's supervisors hardly indicate any sort of nefarious plan to create an intolerable work environment. *See Sullivan v. Hosp. Auth. of Metro. Gov't of Nashville*, No. 3:14-cv-00756, 2016 WL 1259559, at *6 (M.D. Tenn. Mar. 28, 2016) (holding that "heightened scrutiny . . . is insufficient to establish an objectively intolerable work environment." (citing *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002))). Plaintiff quotes from the second alleged email, claiming Assistant Chief Scruggs stated to Chief Roddy "that he would foot the bill for any potential missing gear from Plaintiff 'if it means not exposing

---

[8] "[W]hether a reasonable person would have felt compelled to resign depends on the facts of each case, but [courts] consider several factors, including but not limited to, reduction in salary and badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Lee v. Cleveland Clinic Foundation*, 676 F. App'x 488, 495 (6th Cir. 2017) (citation omitted). Plaintiff has not alleged any reduction in salary, reassignment of job duties, or the like.

anyone else from our agency to additional exposure to Mrs. Rogers.'" [Doc. 38 at Page ID # 454].

Even if this does show "disdain," as Plaintiff claims [*id.*], it does not demonstrate an intolerable work environment. If anything, it shows leadership wanted to *avoid* additional problems with Plaintiff, not create them. *See Okakpu-Mbah v. Postmaster Gen.*, No. 21-2811, 2022 WL 3928534, at *4 (6th Cir. Aug. 31, 2022) ("And 'rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law.'" (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992))).

Accordingly, the alleged quotations from the emails—even if accepted as accurate although not provided to the Court—do not salvage Plaintiff's claim. In addition, Plaintiff does not suggest that she was aware of these alleged emails at the time of her resignation, so the emails themselves cannot be said to have contributed to any intolerable working conditions from Plaintiff's perspective. *See Groening*, 884 F.3d at 630 (board president's complaints about plaintiff-employee's performance "can hardly be said to have created intolerable working conditions" where plaintiff-employee was not aware of them until she filed suit and discovery commenced (citation omitted)).

Plaintiff also cites to her deposition testimony regarding a conversation she had with her sergeant ("Sgt. Forbes") on April 19, 2021. According to her testimony, Sgt. Forbes expressed to Plaintiff that he was required to "come talk" to Plaintiff, "but he thought it was all bulls**t of how [she] was being treated but when he was tasked to do something, he had to come talk to [her]." [Doc. 38-2 at Page ID # 485]. The conversation was memorialized by Sgt. Forbes in a memo he drafted that same day:

> On 4/19/2021 I, Sgt. George Forbes #893 spoke with Officer Sarah Rogers #765 regarding the Blue Team alert that she received. Officer Rogers was asked if there was anything that she needed as in counseling or EAP. Officer Rogers advised that she did not need

any of that type of assistance. Officer Rogers cited that she is frustrated with some of the things that are happening at the present time with the department. As her supervisor, I am concerned with her frustration over some of the issues that she is having within the department, but is unable to talk about. Furthermore Officer Rogers and [I] spoke about the circumstances of what triggered the alert. Upon review of the circumstances I do not see that there are any issues with her actions or behavior. Officer Rogers was receptive with the dialogue that we had and continues to be a valuable member of this team.

[Doc. 36-32].

The vague assertion that Sgt. Forbes thought the investigations were "bulls**t," which he expressed only in a private conversation to Plaintiff, also does not change the Court's analysis. The same is true for Plaintiff's testimony that Sgt. Forbes stated, "I've never seen IA go after somebody so bad over an investigation." [Doc. 36-8 at Page ID # 202]. Accepting that Sgt. Forbes made these statements as Plaintiff claims, his subjective beliefs about the investigations are insufficient. *See Okakpu-Mbah*, 2022 WL 3928534, at *6 (supervisor's testimony that plaintiff was fired "in part because of her race" and that white employees "were treated better" held insufficient for discrimination claims to survive summary judgment in absence of other supporting evidence and specific examples).

It is not clear whether Plaintiff intended to support her discrimination/constructive discharge claim with Officer Blevins's alleged threat that he would not provide backup to Plaintiff. To the extent she is, and accepting as true that Officer Blevins made the threat, Plaintiff cites to no proof in the record that she complained about the threat to anyone prior to her resignation or that Defendants were otherwise aware of and tolerated the threat prior to her resignation. *See, e.g., Davis v. Crescent Elec. Supply Co.*, 200 F. Supp. 3d 875, 894-95 (D.S.D. 2016) (to establish constructive discharge, employee "must show that she gave her employer a reasonable opportunity to remedy a problem before the employee quit" (citing *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669

13

F.3d 888, 893 (8th Cir. 2012)); *Porter v. Erie Foods Int'l, Inc.* 576 F.3d 629, 639-40 (7th Cir. 2009) (holding that "the constructive discharge test sets a high bar in order to give an employer an opportunity to address the situation before an employee resigns"). The only proof in the record the Court could find regarding CPD leadership's knowledge of such a threat, or more accurately lack thereof, consists of the affidavit of Major Jonathan Chambers and the affidavit of Sgt. Patrick Hubbard. Both affidavits state: "I am not aware of any allegations made by Plaintiff during her employment that other male officers failed to respond as backup to traffic stops in retaliation for her claims of sexual assault against another cadet." [Doc. 36-9 & Doc. 36-12]. Plaintiff does not cite to any evidence in the record to dispute these sworn statements.

Plaintiff also complains the IA investigation into the 2016 incident caused her "humiliation, [and] embarrassment." [Doc. 38 at Page ID # 450]. She characterizes her initial interview by Sgt. Willoughby and Sgt. Taylor as a "bombard[ment]" that she was "completely blindsided by." [*Id.*]. She claims it amounted to "harassment by IA" [*id.*]. In her deposition, she testified that during the interview one of the sergeants told her she could be charged with "a felony for extortion." [Doc. 38-2 at Page ID # 480]. She also cites a suggestion, made by Captain Nathan Vaughn, that Plaintiff mediate or discuss the 2016 incident with Smith as being part of a "pattern of insensitivity towards the incident and Plaintiff" [Doc. 38 at Page ID # 451].

Accepting Plaintiff's account as true, a surprise interview and any suggestion that a rape victim mediate with her alleged rapist is reasonably viewed as insensitive and inappropriate. However, Plaintiff surely knew an investigation would be underway once Smith reported the 2016 incident at her request. It was entirely reasonable for IA to seek out an interview with her as she was one of the three individuals present during the incident, and the initial stages of the investigation resulted in a recommendation of serious charges against Smith. Any notion that

14

Plaintiff could be charged with "extortion" in connection with the 2016 incident appears to be wholly inappropriate. However, Plaintiff was notified three weeks later (long before her resignation) that any statements she made during the IA investigation, or evidence discovered as a result of her statements, "can never be used against [her] in any criminal proceeding; except for perjury or false swearing in a subsequent court case." [Doc. 38-2 at Page ID # 513]. *See Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 708-09 (6th Cir. 2004) (inappropriate comments regarding employee's exercise of FMLA rights found not to constitute constructive discharge due to their "fleeting nature"). As for the mediation suggestion, it appears to have been made to counsel, and not directly to Plaintiff, which eased any coercive or insulting impact.[9] Moreover, Plaintiff does not claim she was ever forced to directly communicate with Smith concerning the 2016 incident. It further bears noting that Plaintiff herself confronted Smith in 2020 to discuss the incident and how they would both move forward.

Finally, Plaintiff appears to take umbrage at CPD's decision to excuse her from "line-ups," presumably meaning a regular meeting of all officers in a given district. Plaintiff fails to address why this contributes to an intolerable workplace given that *her attorney* requested this very accommodation. Granted, the request was made as one of two alternatives, but the email plainly indicates Plaintiff would accept either option:

> I am writing to make one request. She would request that she not be required to appear in line up with Officer Smith. She does not feel she should be moved to another line up under the circumstances. If he is not moved, she would request to be allowed to not appear at line up until this matter is sorted out and a decision is made. . . .
>
> I would appreciate you considering this as an alternative to the present situation.

---

[9] Plaintiff retained different counsel in connection with the instant lawsuit.

[Doc. 38-2 at Page ID # 517]. Plaintiff does not contend that she ever objected to this accommodation or declined to accept it.

Accordingly, the Court finds that even when the evidence of record is viewed in the light most favorable to Plaintiff and all reasonable inferences are made in her favor, there is insufficient evidence for a reasonable juror to find Defendants created working conditions so intolerable that any reasonable person would have felt compelled to resign. This is true even when the cumulative effect of the foregoing evidence is considered. The Court's "job is to confirm that the plaintiff's work conditions were indeed hellish, or at least close to it," and this is not such a case. *Tchankpa*, 951 F.3d at 815 (in ADA case, holding plaintiff was not constructively discharged despite his employer "(1) forcing him to lift heavy laptops despite his shoulder injury; (2) denying his work-from-home request; (3) threatening to fire him; (4) giving other employees preferential treatment; and (5) giving him unwarranted negative feedback"). As a result, the Court finds Plaintiff cannot establish she was constructively discharged. She has not otherwise alleged or cited to proof of an adverse employment action based on her sex, and therefore she has not met her burden of stating a prima facie case of sex-based discrimination under Title VII or the THRA. Defendants are

16

entitled to summary judgment on these claims based on the record before the Court and the arguments made by the parties.[10]

## B. Retaliation

Under both Title VII and the THRA, "an employee may bring an action against an employer for retaliating against individuals who oppose a discriminatory practice," and "[c]laims under the respective laws are evaluated identically." *Kirkland v. City of Maryville*, 54 F. 4th 901, 910 (citing 42 U.S.C. § 2000e-3(a); Tenn. Code Ann. § 4-21-301(a); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008)). Like a discrimination claim, a retaliation claim follows the *McDonnell Douglas* burden-shifting framework. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015). To establish a prima facie case of retaliation under Title VII, a plaintiff must show: "(1) [s]he engaged in a protected activity; (2) [her] exercise of such a protected activity was known by the defendant; (3) the defendant subsequently took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected

---

[10] Although not directly addressed by the parties, the Court also notes that Plaintiff failed to show she was treated differently than similarly situated, non-protected employees. While she states she "was being disciplined and reprimanded for petty or minor infractions while her assailant was left undisciplined for such an egregious action []" [Doc. 38 at Page ID # 453], Plaintiff does not allege that IA failed to investigate Smith for conduct similar to the conduct Plaintiff was investigated for in the incidents listed above. It appears her only argument is that he was not disciplined for the alleged rape in 2016. However, the charges against Smith were ultimately "not sustained," [Doc. 38-2 at Page ID # 532-33], meaning the "investigation failed to produce a preponderance of the evidence to either prove or disprove the allegation[.]" [Doc. 36-10 at Page ID # 212]. If Plaintiff claims she was subjected to discipline for charges ultimately "not sustained," that is not clear from her arguments or the factual record. Comparators must be "nearly identical" in "all relevant aspects" of their employment. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) (citations omitted). "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004). In *Okakpu*, the Sixth Circuit further held that two employees who both receive "negative reviews" are not necessarily similar situated; "instead, the review must concern similar work issues." 2022 WL 3928534, at *5 (citing *Colvin v. VA Med. Ctr.*, 390 F. App'x 454, 458-59 (6th Cir. 2010)). Plaintiff points to no such proof.

17

activity and the materially adverse action." *Briggs v. Univ. of Cincinnati*, 11 F. 4th 498, 514 (6th Cir. 2021) (citations and quotation marks omitted).

A "materially adverse action" is one that "might [] dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775-76 (6th Cir. 2018) (citation omitted). Plaintiff's "burden of establishing a materially adverse employment action is less onerous in the retaliation context" than in the discrimination context. *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014). Nevertheless, to be materially adverse, the retaliation must "produce[] an injury or harm." *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). To establish the causal connection element, Plaintiff must "demonstrate that her engagement in a 'protected activity was a but-for cause of the alleged adverse action by the employer.'" *McGarity v. Birmingham Public Schools*, No. 20-2176, 2021 WL 4568050, at *5 (6th Cir. Sept. 7, 2021) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). "Assigning but-for causation to the retaliation depends on whether the employer would have taken the same adverse action in the absence of the protected conduct." *McGarity*, 2021 WL 4568050, at *5 (citing *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009)).

It appears Plaintiff relies on the same proof addressed above in connection with her retaliation claim. The Court need not repeat the above discussion of this proof. It suffices to note that, first, no reasonable juror could find a causal connection between Plaintiff's allegations against Smith and the eight post-September 2020 investigations she relies on in support of her claims. The majority of these were initiated as a result of citizen complaints, and despite Plaintiff's allegations, the record reflects they involved her Chain of Command and she was not disciplined as a result of these investigations prior to her resignation. *Cf. Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558,

570 (6th Cir. 2019) (affirming denial of employer's Rule 50 motion where employee was subjected to nonstop supervision paired with constant write-ups for minor infractions such as for "unexcused absences even when she provided doctor's notes excusing these absences," and employee was ultimately fired).[11]  *See Sutton v. Ohio Dep't of Rehab. & Corr.*, No. 3:21 CV 962, 2023 WL 4564385, at *8-10 (N.D. Ohio July 17, 2023) (granting summary judgment on employee's retaliation claim where investigations into employee's conduct "caused frustration and stress" but employee received no discipline as a result of the investigations).  The remaining two investigations concerned Class I allegations against Plaintiff, which CPD requires to be investigated by IA.  Nothing in the record beyond Plaintiff's conclusory allegations suggests the investigations were initiated or mishandled due to Plaintiff's allegations against Smith or her sex.

Plaintiff does emphasize that the alleged uptick in investigations occurred after she confronted Smith and he reported the 2016 incident to IA at her insistence in early September 2020.  True, "more frequent disciplinary writeups of plaintiff for trivial matters and unwarranted criticism of plaintiff's work" have been held to be "sufficient, '[w]hen viewed as a whole,' to 'support the jury's finding that defendants retaliated against plaintiff.'"  *Hubbell*, 933 F.3d at 570. (quoting *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)).  Likewise, being subjected to unjustified disciplinary writeups that eventually result in termination may suffice to support a finding of retaliation.  *Id*.  Plaintiff's case, however, does not rise to this level.

---

[11] Neither party cites to nor relies on *Hubbell*.  In *Hubbell*, the circumstantial evidence established but-for causation.  After the plaintiff explicitly disagreed with her employer's opinions about women, her employer "took several actions that made her job harder."  933 F.3d at 563.  *Hubbell* also differs from this case because the plaintiff had never been cited for disciplinary reasons until after her protected activity.  *Id*.  The employer's statements in *Hubbell* were also more indicative of animus as the employer suggested that women were better suited for administrative roles and that the plaintiff would have a difficult time at the company if she did not take a demotion.  *Id*.

In this case, the first-in-time investigation Plaintiff relies on involves a fatal shooting and Plaintiff does not contend the investigation into this incident was retaliatory [*see* Doc. 36-8 at Page ID # 182]. The record reflects Plaintiff was treated the same as the other officer involved, Officer Joseph Ogg [*see* Doc. 36-27 at Page ID # 357]. The next investigation was based on an incident that occurred on December 12, 2020, and was reported to IA via a citizen complaint on December 15, 2020 [*see* Doc. 36-19 at Page ID # 251]. Because of the three-month gap, Plaintiff cannot rely on "temporal proximity" to establish the causal connection element. This is especially true considering there is no dispute the investigation was initiated only because of a citizen complaint. *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448-50 (6th Cir. 2020) (finding that a "roughly 75-day delay" between plaintiff-employee's "protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation," and that "other indicia to support a causal connection . . . are lacking"; further finding that complaints against the plaintiff-employee constitute intervening cause that "dispels any inference of causation"). In addition, Plaintiff does not contend the pre-September 2020 investigations involved conduct similar to the conduct at issue in the post-September 2020 allegations, or that the conduct at issue in the post-September 2020 investigations had previously been tolerated. *See id.* (holding that "heightened scrutiny is reflected by a similar three-step pattern: an employee engages in conduct that, while technically objectionable, is blessed, or at least tolerated, by the employer; the employee engages in protected activity; the employer then takes an adverse action against the employee for conduct the employer had previously allowed").

Furthermore, there is no proof Plaintiff complained about Officer Blevins's alleged threat or that Plaintiff's supervisors or CPD leadership were otherwise aware of the alleged threat prior to Plaintiff's resignation. *See Garcia v. Beaumont Health Royal Oak Hosp.*, No. 22-1186, 2022

WL 5434558, at *7-8 (6th Cir. Oct. 7, 2022) (holding that to establish coworker retaliation claim, plaintiff-employee must show "supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and . . . supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances," and noting "this claim is not easily established").

The IA investigation into the 2016 incident—including the interview with Sgt. Willoughby and Sgt. Taylor, the extortion comment, the mediation comment, and the excusal from "line-ups"—likewise does not constitute a materially adverse action. Again, Plaintiff requested the excusal from line-up and the record does not reflect that she objected to this treatment at any point. Although the interview regarding the 2016 incident blindsided Plaintiff and caused her distress and the extortion comment was unfortunate, Plaintiff cites to no authority or proof in the record that the interview "injured" her or that it was so offensive it would have persuaded any reasonable worker from coming forward with the allegations. *See Mason v. City of Livonia*, No. 06-14032, 2008 WL 880191, at *9-10 (E.D. Mich. Mar. 31, 2008) (defendant-employer entitled to summary judgment on title VII retaliation claim; finding plaintiff-employee's evidence that her supervisor threatened her after she filed EEOC complaint was insufficient).

Plaintiff cites to *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003), to argue:

> The reasonableness of the decisions by the employer "is critical in determining whether the proffered judgment was the employer's actual motivation" and therefore, it should be left to the factfinder to determine whether the actions taken by [CPD] were reasonable or whether they were a pretext for discrimination and an attempt to have Plaintiff resign.

[Doc. 38 at Page ID # 459 (quoting *Wexler*, 317 F.3d at 577)].

*Wexler* is distinguishable. For one, the portion of *Wexler* Plaintiff relies on relates to pretext, the second step in the *McDonnell Douglas* framework. The facts are also very different in *Wexler*. The plaintiff-employee in that case alleged he was demoted due to his age. He presented proof of statements made by the president and vice-president of the defendant-employer that the plaintiff "was getting older," and that the company was "going to really be grinding their managers in the future," which the plaintiff would not "want to be doing," as well as references to the plaintiff as "a bearded, grumpy old man," "pops," and "old man." *Wexler*, 317 F.3d at 570-71. The president also made "repeated references . . . to the youth of [the plaintiff's] replacement" in the same discussion of the plaintiff's age. *Id.* at 570. The employer presented proof of declining sales as its explanation for the plaintiff's demotion, but the plaintiff produced evidence "showing that the management . . . knew that the company's advertising strategy had hurt sales throughout the chain," and further that another younger manager was not demoted "despite similarly dismal profits." *Id.* at 577. The district court dismissed the case on the employer's motion for summary judgment and the judgment was reversed on appeal. The Sixth Circuit found a reasonable juror could find that the plaintiff's individual poor sales performance "was insufficient" to warrant his demotion based on the age-related comments and the chain-wide decrease in sales. *Id.* The Sixth Circuit further found the retention of the younger manager with poor sales "undermines the explanation that store revenue is critical to a store manager's job security." *Id.* The case at bar bears no factual similarities at all, and Plaintiff fails to address the stark differences between her own proof and the proof presented by the *Wexler* plaintiff.

Accordingly, the Court finds Plaintiff cannot establish a prima facie claim of retaliation, even when the facts are viewed in the light most favorable to her and all reasonable inferences are made in her favor. No reasonable juror could find that Plaintiff's allegations regarding the 2016

22

incident were the but-for cause of the eight investigations she relies on in her brief. The remaining facts Plaintiff relies on likewise do not show a materially adverse action, considered separately or together with the investigations. Therefore, Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

## C.     Hostile Work Environment

It is not clear whether Plaintiff intends to assert a separate claim for hostile work environment or if her allegations of a hostile work environment are part of her retaliation claim. Regardless, to establish a prima facie case of hostile work environment, she must show the following:

> (1) [she] belongs to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on [her membership in the protected class]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action.

*Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (citation omitted).

The standards for proving a hostile work environment claim are not as stringent as the standards for proving a constructive discharge. *See Laster*, 746 F.3d at 728. Nevertheless, Plaintiff's hostile work environment claim fails for the same reasons discussed throughout this opinion. That is, Plaintiff points to no proof in the record that the investigations were initiated or conducted as a result of Plaintiff's sex, as opposed to as a result of complaints made against Plaintiff and/or the serious nature of the conduct leading to the investigations (fatal shooting/confrontation with fellow officer in front of civilian). She has not produced any direct evidence of sex-specific, derogatory language; and as discussed above, she has not demonstrated that her alleged harassers treated male officers differently when faced with similar allegations. *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (discussing methods of

23

establishing the "based on" element of a hostile work environment claim). The same is true for the alleged emails between high-ranking CPD officials, Officer Blevins's alleged threats, and the way the IA investigation into the alleged rape was carried out.

In addition, it does not appear Plaintiff was aware of the CPD emails prior to her resignation. And Plaintiff does not contend she reported Blevins's threats to her supervisors or CPD leadership prior to her resignation, such that Defendants cannot be said to have known about the threats and failed to act. The Court need not belabor these points further. Even if Plaintiff is attempting to, she cannot establish a prima facie case of hostile work environment based on her sex, even when the facts are viewed in the light most favorable to her and all reasonable inferences are made in her in favor. To the extent Plaintiff is attempting to assert a claim for hostile work environment separate from her retaliation claim, Defendants are entitled to summary judgment.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [Doc. 36] is **GRANTED** and Plaintiff's claims are hereby **DISMISSED** in their entirety. **AN APPROPRIATE JUDGMENT SHALL ENTER.**

SO ORDERED.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

24